IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| v. ) | **CASE NO. 1:21-CR-00736-01** |
| ) | **(Judge Boasberg)** |
| **MARK ANDREW MAZZA,** ) | |
| ) | |
| **Defendant** ) | |

**POSITION OF DEFENDANT WITH
RESPECT TO SENTENCING FACTORS**

COMES NOW the defendant, Mark Andrew Mazza, by Gregory B. English, his court-appointed counsel, and submits this pleading in accordance with Rule 32 of the Federal Rules of Criminal Procedure and U.S.S.G. §6A1.2.  We concur with the computations of the probation office and have no objections to the presentence report (hereinafter "PSR").  Notwithstanding the guidelines, we submit that the appropriate sentence would be time served.

**The §3553(a) Factors**

Title 18, U.S. Code, §3553(a) supports our request for this sentence.  The decision of the Supreme Court in United States v. Booker, 543 U.S. 220 (2005), effectively rendered the federal sentencing guidelines advisory.  Booker requires this court to consider all of the factors listed at 18 U.S.C. §3553(a), including the advisory guidelines, in imposing a just sentence.  The overriding principle of §3553(a) is that courts impose a sentence "sufficient, but not greater than necessary" to comply with the four purposes of sentencing which are retribution, deterrence, incapacitation, and rehabilitation.  This is

commonly referred to as the "Parsimony Provision." The Parsimony Provision effectively puts a ceiling on the sentence provided by the other factors. Furthermore, the judge is required to "recogniz[e] that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. §3582(a).

These §3582(a) factors are listed as follows:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the kinds of sentence available;
(3) the guidelines and policy statements issued by the Sentencing Commission, including the (now nonmandatory) guidelines range;
(4) the need to avoid unwarranted sentencing disparity; and
(5) the need to provide restitution where applicable.

It is important to note that neither the statute itself nor Booker suggest that any one of these factors is to be given greater weight than any of the others, but all are subservient to the §3553(a) mandate to impose a sentence not greater than necessary to comply with the four purposes of sentencing.

The Supreme Court in Kimbrough v. United States, 552 U.S. 85 (2007), and Gall v. United States, 552 U.S. 38 (2007), reemphasized that the federal sentencing guidelines are simply an advisory tool to be considered alongside other statutory considerations spelled out in 18 U.S.C. §3553(a). In two summary reversals the Supreme Court expressed in no uncertain terms that the guidelines cannot be used as a substitute for a sentencing court's independent determination of a just sentence based upon consideration of the statutory sentencing factors set forth at 18 U.S.C. §3553(a). *See* Nelson v. United States, 555 U.S. _, _ S.Ct. _, 2009 WL 160585 (Jan. 26, 2009); and Spears v. United States, 555 U.S. _, _ S.Ct. _, 2009 WL 129044 (Jan. 21, 2009). "Our cases do not allow a sentencing court to presume that a sentence within the applicable

2

Guidelines range is reasonable," the court held in Nelson. 2009 WL 160585, *1. "The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." *Id.* at *2. In other words, sentencing courts commit legal error by using a sentencing guidelines range as a default to be imposed unless a basis exists to impose a sentence outside that range. *See also* United States v. Johnson, _ F.3d__ (2009), 2009 WL 161733 at *5 (6th Cir. Jan. 26, 2009) ("[I]t is clear that Spears applies with equal force to sentencing decisions under the new crack-cocaine guidelines and that district courts may categorically reject and vary from the new guidelines based on policy disagreements with those guidelines.").

We ask the court to consider the following when applying the §3553(a) factors.

On the first day of the Congressional Hearings investigating the events of January 6, the democratic leadership announced that the riots that day were caused at the instigation of President Trump who lied about a stolen election. We agree completely with this assessment. We note that the defendant visited Washington to participate in a lawful rally as it was his constitutional right to protest the Congressional certification of electoral college. Page 5, paragraph 19, PSR. Mr. Mazza followed rioters to the Capitol and eventually participated in the activities which resulted in the instant indictment. It is clear that he was initially participating in a legal activity at the request of the President of the United States doing what he though was right, and then spontaneously joined in a riot. He naively believed the president. This was a unique event in American history and not likely to ever be repeated so the chance of the defendant engaging in any future similar legal activity is remote at best. It is clear he did not leave Indiana with the intent to commit a crime at this rally. It is significant that while he was illegally present on the Capitol grounds he took steps to assist an officer who was being assaulted by other rioters. Page 8,

paragraph 26, PSR. Moreover, the attached letter from AUSA Chawla describes a recently recovered video which purportedly shows Mr. Mazza using the stolen police baton to push another rioter to protect a capitol police officer. This reinforces our contention that he started out acting with good intentions.

The PSR accurately states that Mr. Mazza took a baton from an MPD officer and struck him with it. Page 7, paragraph 24, PSR. Mr. Mazza's contention is that the officer struck him with the baton first and he took it away and hit the officer with it so he would know what it felt like. This was clearly not a legal case of self-defense; however, the defendant took this action after being provoked by the officer who essentially assaulted him first. We do not know whether the officer will admit that that is what he did, but that is what the defendant said happened and it is a mitigating factor.

The PSR correctly notes at Page 6, paragraph 20, that Mr. Mazza took a Judge revolver from Indiana to Washington and had it in his possession on January 6. He lost possession of it on the Capitol grounds before 2:45 p.m. Id. We note that Mr. Mazza possessed a concealed firearm permit from the state of Indiana at that time. Paragraph 19, pages 5-6, PSR; Paragraph 82, page 17, PSR. In his experience the states neighboring Indiana have reciprocal concealed permit laws which allow an Indiana resident with a valid permit to carry a concealed weapon in these states. He believed that this was also true in the District of Columbia. Clearly, he was not aware of the D.C. gun laws. We admit that ignorance of the law is not a valid defense. However, it is a factor in mitigation in that he did not illegally obtain the firearm sub judice. He believed that he would be staying at an establishment in a high crime portion of D.C. so he brought

a firearm for his own protection. He never used it on the Capitol grounds. Indeed, if he had not lost it no one would have ever known that he had it in D.C. So no harm was done by this crime.

Mr. Mazza is a veteran of the United States Army who served in an armor unit in Germany at the height of the cold war. Paragraph 19, page 15, PSR; Paragraph 85, Page 17, PSR. He served from March of 1985 until February of 1988 where he attained the rank of Specialist 4 which is the same pay grade as a corporal. Id. During his service he received four Army Good Conduct Medals and two Army Commendation Medals. Id. Paragraph 85 of the PSR states that he received two Army "acorns" which is clearly a result of the probation office not understanding the Army vernacular. The Army Commendation Medal, which is awarded for meritorious service for non-combat duties, is commonly referred to as an "ARCOM". Mr. Mazza obviously failed to explain this adequately to the probation office. During his 18 months in an armor unit in Germany the Army was in the field constantly maintaining a high state of readiness because of the realistic fear that the Soviet Army would invade through the Fulda Gap where the lowlands provided ideal terrain for tank operations so the Army was constantly practicing for this eventuality at the time he was there. We note parenthetically that the Berlin Wall did not collapse until November 9, 1989 which was well after he had returned to the United States. For the soldiers assigned there this was rigorous duty involving long days of work and hardships because a sleeping bag covered by a tent is not a comfortable place to be during a winter night in Germany and MRE's (i.e., Meals Ready to Eat) will keep a soldier alive but are notoriously unappetizing. He is a disabled veteran because he fractured his

C5-C6 vertebrae which caused him to be awarded a disability pension of $1,500 a month. Paragraph 73, page 16, PSR; Paragraph 90, page 18 PSR.  He has served as the vice chair of Disabled American Veterans in Indiana and was a founding member of a program that provides resources to veterans that suffer from PTSD.  Paragraph 83, page 17, PSR. He suffers from PTSD himself. Paragraph 77, page 17, PSD.

Mr. Mazza has accepted complete responsibility in this case.  This began when he was interviewed by U. S. Capitol Police agents on March 25, 2021 where he admitted that he attended the "Stop the Steal" rally, that he lost his firearm in a crowd of people, that he filed a false police report for the allegedly stolen firearm, and that he was in the thick of the riot.  Paragraph 29, page 9. PSR.  When interviewed by the probation office he candidly admitted his extensive history of substance abuse.  Paragraphs 78-79, pages 16-17, PSR.

The probation office correctly noted that Mr. Mazza's only significant criminal history was a misdemeanor battery offense that occurred in 2021.  Paragraph 53, pages 12-13, PSR.  The factual basis for this offense is compelling.  His former wife with whom he has two children, Suzette Pierra, is Brazilian. Paragraph 68, page 15, PSR.  His children are biracial.  The offense occurred when neighborhood thugs instigated a confrontation by calling his children the "n word", and he responded to protect them.  This was obviously not an aggravated offense because the only penalty imposed was a fine of $185. Paragraph 53, page 12, PSR.  We submit that if this conduct had occurred in the District of Columbia it is highly unlikely that any charge would have been filed.

6

During the time that Mr. Mazza has been held in pre-trial detention, he has been housed in the Northern Neck Regional Jail in Warsaw, Virginia.  Because of the safety precautions taken by this facility because of covid, his conditions of confinement have been onerous.

We note that the probation office had correctly determined that the DC guidelines permit a sentence of probation for the CPWOL offense which can be imposed concurrently with the federal offense.  Paragraphs 102 and 104, Pages 19-20, PSR. We ask this court to impose a concurrent term of probation for that offense.

Appended for this court to consider are two character letters written by his friends. They describe what he is like as a person, a perspective not reflected in the PSR.

Under these circumstances, we respectfully submit that this court should grant a variance from the guidelines pursuant to §3553(a) and impose a sentence of time served.

 One other factor supports this position.  In the past three decades the United States has experienced significant sentence inflation as the number of prisoners nearly tripled between 1987 and 2007 with more than 2.5 million adults incarcerated nationwide in the beginning of 2008, more than one in every 100 citizens.[1] It has continued to grow since then. The United States has 5% of the world's population and 25% of the world's prison population.[2]   In the words of former Virginia Senator Jim Webb, "either we are the

---

[1] "Expanding the Zones, a Modest Proposal to Increase the Use of Alternatives to Incarceration in Federal Sentencing," *Criminal Justice* (Publication of the American Bar Association), Winter 2010, by J. P. Hanlon, Sean Hecker and David Gopstein, at Page 26.

[2] "What's Wrong With Our Prisons?", *Parade Magazine*, March 29, 2009 at Page 4 by former Virginia Senator Jim Webb.

most evil people on Earth or we are doing something very wrong. Id.  According to U.S. Courts News, the annual cost of imprisonment in a Bureau of Prisons facility for fiscal year 2010 was $28,284.16, and the annual cost of probation supervision for the same period was $3,938.35.  These amounts have increased every year since then.

We respectfully submit that considering the economic crisis this country is facing, it should not be worsened by any additional incarceration of the defendant for longer than necessary.

Assuming, arguendo, that this court decides to impose additional incarceration, we request that it make the following recommendations to the Bureau of Prisons:

1. That the defendant be housed in a minimum security facility either in or close to Indiana so he will have an opportunity to see his family while incarcerated. Mr. Mazza is a 57 year old partially disabled veteran. Page 2, PSR; paragraph 90, page 18, PSR.  While he has been in Warsaw prison gangs have extorted protection money from him.  If he were to be confined at a Gladiator Factory such as FCI or USP Terre Haute he would be perceived as being an "easy victim" and subjected to endless abuse so a minimum security placement is appropriate.

2. That the defendant be allowed to enter the RDAP to address his substance abuse problems.  We note that the probation office has also recommended this.  Paragraph 121, page 22, PSR.

Respectfully submitted,

    /s/  Gregory B. English
Gregory B. English, DC Bar #398564
The English Law Firm, PLLC
601 King Street, Suite 406
Alexandria, Virginia  22314
(703) 739-1368 / Fax (703) 836-6842
gbeuva@gmail.com
*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of September, 2022 a true copy of the foregoing pleading was filed with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s):

    AUSA Tejpal Singh Chawla
    tejpalchawla@usdoj.gov

    /s/ Gregory B. English
    _____
    Gregory B. English