# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-736-JEB** |
| **MARK ANDREW MAZZA,** | **Sentencing Date: October 5, 2022** |
| **Defendant.** | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Mark Andrew Mazza ("Mazza") to seventy-eight (78) months' incarceration, three years of supervised release, $2,150 in restitution, and the mandatory $100 special assessment for each count of conviction.

## I.     INTRODUCTION

The defendant, Mark Mazza, violently participated in the January 6, 2021, attack on the United States Capitol that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.7 million dollars' in losses.[1]

Mazza, a 57 year-old Army veteran from Shelbyville, Indiana, brought **two** loaded

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police."

handguns with him to Washington, D.C. when he attended the "Stop the Steal" rally on the National Mall on January 6, 2021: a Smith and Wesson, .40 caliber semi-automatic handgun, and a .45 caliber/.410 caliber revolver (the "Taurus Judge"). [2]   Mazza loaded his Taurus Judge with both with shotgun shells and cartridges containing hollow point bullets, which are bullets that expand on contact and are significantly more lethal than regular bullets.  After attending the rally while armed with both firearms in holsters on his person, Mazza marched to the U.S. Capitol with his friend, Roger Kent Baugh ("Baugh"),[3] and joined in efforts to move through restricted Capitol grounds.  As Mazza and Baugh moved up the West side of U.S. Capitol Building on the Lower West Terrace ("LWT"), Mazza lost the Taurus Judge.   Undeterred, Mazza continued up the LWT to a tunnel area which led to an entryway into the U.S. Capitol Building.

In the LWT tunnel, Mazza joined a mob of other rioters who were trying to break through the police line to gain entry into the lower level of the U.S. Capitol Building.  There Mazza, while armed with the .40 caliber loaded firearm, engaged in multiple efforts to break through the police line: he repeatedly pushed against officers using the combined physical exertion of the mob; he armed himself with a stolen police baton and assaulted officers with the baton; he yelled at officers telling them to get out the mob's way and to "Get out of our house!"; he held open the

---

[2] The Taurus Judge is a five-shot revolver capable of chambering both .45 colt and 410 shotshell (projectiles that contain pellets that disperse in a circular pattern upon firing, like those fired by a shotgun) ammunition. See https://www.taurususa.com/revolvers/taurus-judge (visited September 15, 2022).

After previously admitting his possession of the .Taurus Judge, Mazza later confirmed his possession of the loaded .40 caliber firearm during debrief sessions with the FBI, which he has acknowledged in his plea agreement may be used for sentencing purposes.  *See* Plea Agreement at ¶ 10.

[3] Baugh has been charged by a criminal information with one count of Civil Disorder in 22-cr-313 (JEB) and a plea hearing has been scheduled before the Court on October 21, 2022.

door to the tunnel entrance against the resistance of officers, and after being rebuffed, he gathered additional rioters into the tunnel area to continue "heave-ho" pushes against officers in the doorway. Mazza and the other rioters were forcibly ejected from the tunnel by police officers. Mazza remained on U.S. Capitol grounds for a number of hours thereafter, still armed with the loaded .40 caliber semiautomatic firearm. After leaving Washington, D.C. to return home, Mazza engaged in numerous acts of obstruction of justice, including filing a false police report about how he had lost the Taurus Judge and providing false information to U.S. Capitol Police Special Agents.

Based upon this egregious conduct, the government recommends that the Court sentence Mazza to a total of 78 months' incarceration, specifically consecutive sentences of 66 months for his Assaulting, Resisting or Impeding Certain Officers Using a Deadly or Dangerous Weapon, which is near the mid-point of the advisory Federal Sentencing Guidelines' range of 57-71 months, and 12 months incarceration for the Carrying a Pistol Without a License, which is below the mid-point of the District of Columbia Sentencing Commission's Voluntary Sentencing Guidelines range of 8 to 24 months. This recommended sentence would reflect the gravity of Mazza's criminal conduct, his personal characteristics, and acknowledges his early admission of guilt.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters, Mazza among them, laid siege to the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Many rioters unlawfully entered the U.S. Capitol and attacked and injured

law enforcement officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property.  Their actions also shut down Washington, D.C. in the middle of a busy workday, caused a nationwide-wide panic and caused a city-wide curfew to be ordered by the Mayor of the District of Columbia.[4]  Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

As set forth in the draft Presentence Report ("PSR")[5] and the Statement of Offense incorporated into Mazza's plea agreement, a joint session of Congress had convened at

---

[4] After violence occurred at the U.S. Capitol, D.C. Mayor Muriel Bowser ordered a citywide curfew as a result of the riot at the U.S. Capitol from 6 p.m. on January 6, 2021, until Thursday January 7th at 6 a.m. during which, "no person, other than persons designated by the Mayor, shall walk, bike, run, loiter, stand, or motor by car or other mode of transport upon any street, alley, park, or other public place within the District."  *See https://mayor.dc.gov/release/mayor-bowser-orders-citywide-curfew-beginning-6pm-today*.  According to the Mayor's subsequent extension of the Order for 15 days on the same day (Mayor's Order 2021-003):

> First Amendment protests have turned violent. Many persons came to the District armed and for the purpose of engaging in violence and destruction and have engaged in violence and destruction. They have fired chemical irritants, bricks, bottles, and guns. They have breached the security of the Capitol and their destructive and riotous behavior has the potential to spread beyond the Capitol.  …
> Today's events and the reasonable apprehension of an ongoing public emergency represent an immediate threat to the health, safety, and welfare of District residents that requires emergency protective actions.

[5] As of the date of filing, the government has not received a final Presentence Report.

approximately 1:00 p.m. at the U.S. Capitol. Members of the House of Representatives and the Senate were meeting in separate chambers to certify the vote count of the Electoral College of the November 3, 2020 Presidential election. By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside. At approximately 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building. Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting law enforcement officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. All proceedings, including the joint session, were effectively suspended. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the

Senate Chamber until the session resumed. *See* Statement of Offense ¶¶ 2-9; Draft PSR ¶¶ 13-18.

### *Injuries and Property Damage Caused by the January 6, 2021 Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

In addition, the rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol

Attack.pdf (describing officer injuries).   Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety.   *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building.   They caused extensive, and in some instances, incalculable, losses.   This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways.   *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.7 million dollars.

**B.      Defendant's Role in the January 6, 2021 Attack on the Capitol**

As described in Mazza's Statement of Offense, Mazza crossed state lines from Indiana into the District of Columbia to attend the Stop the Steal Rally in Washington, D.C., while armed with a Taurus Judge, which is a .45 caliber revolver that uniquely can shoot both shotgun shells and regular cartridges.

On the morning of January 6, 2021, Mazza armed himself with both firearms in the District of Columbia.  He did not have a license to carry a firearm in Washington, D.C., nor were his firearms registered in the District of Columbia.  After Mazza and Baugh attended the rally at the Ellipse, at approximately 1:45 p.m., they followed calls to go to the U.S. Capitol and began walking with others from the Rally down Pennsylvania Avenue, N.W. to the U.S. Capitol.  As they entered the U.S. Capitol Grounds, they walked past  signs bearing readily visible warnings printed in large font posted on overturned barriers that clearly stated the area was closed to the public.  Image 1, below, is a selfie-style photograph that Mazza took and posted on Twitter  that shows his appearance and clothing on January 6, 2021, before the riot began.



**<u>Image 1</u>**

As they walked, the two entered onto restricted U.S. Capitol Grounds where then Vice President Pence was presiding over the Electoral College certification vote by the United States Congress.   Neither Mazza or Baugh had authorization or permission to enter U.S. Capitol Grounds, or to possess any firearm.[6]   At approximately 2:30 p.m., Mazza dropped or lost the Taurus Judge revolver on the steps leading up to the West Front Terrace on the U.S. Capitol. At approximately 2:30 p.m. on January 6, CW-2, a U.S. Capitol Police Sergeant who was assaulted

---

[6] It is unlawful to carry a firearm on U.S. Capitol Grounds unless authorized under U.S. Capitol Board Regulations.  *See* 40 U.S.C. § 5104(e)(1)(A) (Count Eight of the Mazza Indictment).

on the front of the LWT of the U.S. Capitol Building, recovered the Taurus Judge when it was dropped by the rioter who was assaulting him.[7]

Mazza then continued up the West Front Terrace to a tunnel that led to a doorway to the U.S. Capitol building.  There, rioters broke through the doors and were fighting U.S. Capitol Police ("USCP") and D.C. Metropolitan Police Department ("MPD") officers who were blocking their efforts to enter the building.  Upon arriving at the entrance to the LWT tunnel, Mazza saw rioters assaulting, hitting, and throwing objects at the police officers and using deadly and dangerous weapons against them.  Mazza also observed the rioters physically trying to push the officers over and out of the doorway so they could unlawfully enter the U.S. Capitol Building.

### 1.   *The Attempted Breach of the Capitol Building and Assaultive Conduct in Tunnel Leading to the doors of the West Front of the U.S. Capitol Building*

The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line.  *Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117  Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available   at   https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

One of the most violent confrontations on January 6 occurred in and around the LWT tunnel where Mazza entered.  Mazza was one of a large group of violent rioters who brutally

---

[7] The USCP Sergeant was unable to identify Mazza from a photo array as the person who assaulted him and dropped the gun. Accordingly, the government is not asking the Court to sentence Mazza because of the assault of the USCP Sergeant.  However, Mazza's false statements about when and how he lost the Taurus Judge, described below, remain very relevant for sentencing.

attacked a vastly outnumbered group of police officers who valiantly sought to prevent the breach of the Capitol in that location. That entrance to the Capitol usually consists of a flight of stairs leading to a doorway.  On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long.  That tunnel led to two sets of metal swinging doors inset with glass. On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building. The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building.  This archway is also of great symbolic significance as it has been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and is the entrance for the President-Elect and other dignitaries on Inauguration Day.  Image 2; "Inauguration at the U.S. Capitol", Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.



**<u>Image 2</u>**

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby.  USCP and MPD officers were arrayed inside the doorway and guarding the entrance. By the time Mazza arrived in the LWT tunnel, many of these officers had already physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

At approximately 2:42 p.m., the mob broke the windows to the first set of doors, and the law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist.  The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging law enforcement with batons, poles, chemical

spray, bottles and other items.  Officers created a line in the doorway to block the rioters and physically engaged them with batons and OC spray.  At a later hearing on the events of January 6, Congressman Stephanie Murphy described her experience nearby this location in response to testimony from MPD Officer Daniel Hodges, who was assaulted while caught in the tunnel doors between the two forces:

> January 6th was an attack on our democracy, it was an attack on the peaceful transfer of power, and it was an attack on this Capitol building, but it was also an attack on real people.  And most people don't know this -- and I don't think even you know this -- but your actions had a profound impact on me.  So, at 3:00 p.m. on January 6th, 2021, while you were holding back the mob at the Lower West Terrace entrance, I was holed up with Congresswoman Kathleen Rice in a small office about 40 paces from the tunnel that you all were in.  That's about from the distance where I'm sitting here on the dais to that back wall.  And from that office in close proximity to where you all held the line, I listened to you struggle.  I listened to you yelling out to one another.  I listened to you care for one another, directing people back to the makeshift eyewash station that was at the end of our hall.  And then, I listened to people coughing, having difficulty breathing, but I watched you and heard you all get back into the fight."  Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Rep. Stephanie Murphy) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

The violent and physical battle for control over the LWT entrance in the tunnel and doorway area continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers.  The battle for the LWT entrance involved intense hand-to-hand combat, and some of the most violent acts against law enforcement, including the abduction and tasering of MPD Officer Michael Fanone and the previously mentioned assault of Officer Daniel Hodges.

During this battle, the vastly outnumbered officers were assaulted with all manner of objects and weapons, receiving blow after blow from rioters taking turns assaulting them, all in a

concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification, and overturn the election results by force.  Capitol Police Sgt. Aquilino Gonell, who was present in the tunnel that day, explained:

> What we were subjected to that day was like something from a medieval battle. We fought hand-to-hand, inch-by-inch to prevent an invasion of the Capitol by a violent mob intent on subverting our democratic process. My fellow officers and I were committed to not letting any rioters breach the Capitol. It was a prolonged and desperate struggle. *Id.* (Statement of Sgt. Aquilino Gonell)

Despite the mob's efforts, the officers in the LWT held the line with commendable restraint, and through personal sacrifice and valor.  MPD Officer Michael Fanone remembers one of his colleagues' actions that day:

> In the midst of that intense and chaotic scene, [MPD] Commander [Ramey] Kyle remained cool, calm, and collected as he gave commands to his officers. "Hold the line," he shouted over the roar. Of course, that day, the line was the seat of our American government. Despite the confusion and stress of the situation, observing Ramey's leadership, protecting a place I cared so much about, was the most inspirational moment of my life. The bravery he and others showed that day are the best examples of duty, honor, and service. *Id.* (Statement of Officer Michael Fanone)

Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5 p.m.

Despite being under constant assault, these officers nevertheless provided first aid to injured rioters who were trapped in the tunnel area, including those who had difficulty breathing as a result of chemical irritants that had been used in the tunnel area.  It is not an exaggeration to state the actions of these officers in thwarting the mob at the LWT entrance potentially saved the

14

lives of others, including potential harm to members of Congress.[8]

### 2.    *Mazza's Actions in the LWT Tunnel*

Exhibit 1 is video footage from the Lower West Terrace doors at approximately 3:08:29 p.m. that shows Mazza entering the tunnel area while using his scarf as a cover over his face. Images 3 and 4 below are screen shots from the video footage. Mazza is the rioter inside the red circle in those two images:



**Image 3**

---

[8] The United States intends to file a supplemental video and/or trial testimony recording summarizing the impact the violence had on the other officers in the LWT tunnel prior to sentencing.



**Image 4**

Exhibit 1 further shows Mazza assisting a group of rioters by pushing with others from behind while the group forced their way towards the USCP and MPD officers who were defending the LWT door entrance to the U.S. Capitol.  The MPD Officers were wearing helmets, body armor, and distinctive police attire emblazoned with the words police and "Metropolitan Police Department."  At least 20 MPD and USCP Officers were resisting the mob's efforts to gain entry and were enduring constant attack inside the tunnel while Mazza was there.  Images 5 and 6, below, show Mazza joining in the pushing against  the officers:

16



**Image 5**



**Image 6**

The video footage shows that Mazza continued to the front of the tunnel area toward the line of contact with officers.  Exhibit 2, "*UNBELIEVABLE Footage: Trump Supporters Battle Cops Inside the Capitol*, uploaded January 7, 2021, located at https://www.youtube.com/watch?v=cJOgGsC0G9U ("Unbelievable Video"), shows Mazza skirmish with officers who were using batons, and at some point Mazza seized  a police baton from one of the officers. [9]  Based upon body worn camera date and time stamps, at approximately 3:13:30 p.m. Mazza used that baton as a weapon to assault  police officers inside of the LWT tunnel doorway.  The video also shows Mazza behind one of the glass doors, holding the glass doors open for other rioters with his right hand while clenching a black baton in his left hand.  As he held open the glass door, other rioters assaulted the officers who were defending the tunnel entrance and resisting the rioters.   With his left hand, Mazza struck with full force against MPD Officer P.N.'s ungloved hand, who was in the front line of the officers confronting the rioters.

While MPD Officer P.N. did not suffer a specific injury from Mazza's baton blow, as described in Exhibit 4 (the Victim Impact Statement of MPD Officer P.N.), Mazza's assault on him was one of several violent assaults he suffered on that day.  The video evidence in this case, and the events described in Exhibit 4, document MPD Officer P.N.'s exceptional courage, heroism and determination to stop the rioters and protect the U.S. Capitol despite being knocked down again and again.  MPD Officer P.N. suffered several injuries on January 6, 2021, included two partially torn ligaments in his shoulder and temporary incapacitation from OC spray and

---

[9] Mazza claimed in his post- arrest interview with USCP agents that he took the baton from the control of MPD Officer P.N.

bear spray used by the rioters.  His heroism stands in stark contrast to the lawless and subversive actions by defendant Mazza and the other rioters that day.

Exhibit 2, particularly between time stamps 16:45 to 29:00, captures much of the violent activity inside the LWT Tunnel when Mazza was there.  That video shows Mazza holding the glass door open as other rioters used shields, flag poles, and batons as weapons to strike at the MPD officers, including MPD Officer P.N.  The intent of these rioters was clear: to overcome the officers with force and gain violent entry into the U.S. Capitol to obstruct the Electoral College certification.  During this period, dozens of police officers were assaulted in the tunnel area. Among them was MPD Officer Daniel Hodges, whose head was caught between a door frame and a rioter's shield as another rioter ripped off his gas mask and struck him about the head with his own baton. See Exhibit 2, time stamp 20:00-22:00.  *See Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Officer Hodges) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.[10]

Images 7, 8, and 9 from Exhibit 2 show Mazza participating in these assaults.

---

[10] On September 15, 2022, Judge McFadden convicted Patrick McCaughey (21-cr-40-TFM) – the rioter in the brown cloth jacket who is best seen in Image 13-- of numerous crimes from January 6, 2021, from the LWT tunnel area, including assaulting Officer Hodges.  McCaughey is pending sentencing.



**Image 7**

In Image Seven Mazza's hand, circled in red, can be seen holding open the door as other rioters pushed forward to assault multiple MPD Officers:



**Image 8**



**Image 9**

Exhibit 3 is video from a body worn camera ("BWC") worn by a MPD officer. At 3:15:45 p.m., it shows Mazza actively swinging the baton at police officers. Images 10 and 11, below, are screen shots from that video.



**<u>Image 10</u>**



**<u>Image 11</u>**

As captured in Exhibit 2 at approximately 3:13:58 p.m., and acknowledged in the Mazza's Statement of Offense at ¶ 14, Mazza screamed at the officers, "This is our fucking house! We own this house! We want our house!"   Images 12 and 13, below, which are from another MPD officer's body worn camera, also show Mazda inside the LWT Tunnel, engaging with the officers.



**Image 12**



**Image 13**

Shortly after yelling at the officers, Mazza moved from the front of the tunnel -- where he had committed and witnessed violence against the MPD Officers -- to the back of the tunnel. There, Mazza showed other rioters the stolen police baton. He also pulled other rioters into the tunnel area to attack and push against the officers at the front of the tunnel.  ECF 25 (Statement of Offense, ¶ 15).  Many of these fellow rioters continued the attack and yelled "heave-ho!" as they continued their assault.  These "heave-ho" efforts -- by which multiple rioters collectively used their body mass for greater force in pushing back officers by gaining momentum through leaning back and then pushing forward while chanting "heave-ho" to coordinate their efforts -- resulted in significant physical force and pressure being placed upon the MPD Officers at the front of the tunnel.  After gathering additional people, Mazza also re-engaged in the "heave-ho" efforts, again while armed with the .40 caliber firearm and the stolen baton.  Image 14, a screen shot from Exhibit 1, below, shows Mazza displaying the expandable baton for other rioters.



**Image 14**

Images 15, 16, 17, and 18, which are additional screen shots from Exhibit 1, further show Mazza

leading and encouraging other rioters into the tunnel area to assist it in the assault on the officers

in the tunnel.



**Image 15**



**Image 16**

Images 17 and 18, below, screen shots from Exhibit 1, show Mazza pushing with the group yelling "heave-ho" while armed with a baton.



**Image 17**



**Image 18**

Police forcefully ejected Mazza and other rioters from the tunnel at approximately 3:19 p.m.  But even then, rioters pulled two officers, MPD Officer Michael Fanone and USCP Officer M.M., out of the tunnel and assaulted them.   When Mazza was pulled from the tunnel at approximately 3:20 p.m., he was in close physical proximity to those officers.   Mazza did not assault the officers and video appears to show him trying to protect both officers from other rioters who were assaulting them.[11]  In one video, it appears that Mazza may be striking a rioter who was trying to assault USCP Officer M.M.   The government's recommended sentence assumes that Mazza intended to assist both officers.

Even after being forcibly ejected from the tunnel  and observing extreme violence against the officers, Mazza remained on the Capitol Grounds for several hours and observed additional attacks on officers in the LWT tunnel area.  Mazza told FBI agents who interviewed him that he did not leave the area until police used  flash bang grenades to disperse the crowd later that evening.  Further investigation has indicated this occurred at approximately 5:00 p.m.

### 3.      *Mazza's Actions After the Riot and Obstruction of Justice*

After leaving the District of Columbia, defendant Mazza drove home with Baugh, while still possessing the stolen baton and the loaded .40 caliber firearm.  On January 8, 2021, Mazza, while in Indiana, filed a report, by telephone, with the Shelbyville Police Department (SPD) in Indiana, falsely stating that his Taurus Judge was stolen in the state of Ohio.  On January 13, 2021, to complete the false report, he called the SPD back to provide the serial number for that

---

[11] In an interview with CNN on January 15, 2021, Officer Fanone was asked if he had anything to say to those rioters who helped him return back to the police line after being dragged out of the LWT tunnel, assaulted, and attacked.  He stated, "Thank you, but f**k you for being there." Available    at    https://www.cnn.com/2021/01/14/politics/police-officers-capitol-riot-hodges-fanone/index.html

gun.  This false stolen gun report was communicated to the United States Burau of Alcohol, Tobacco and Firearms ("ATF") in the District of Columbia, and conveyed to the U.S. Capitol Police.  This false report obstructed the law enforcement and grand jury investigation into this matter and required law enforcement officials to expend significant additional time, energy, and resources to determine Mazza's true role and location during the assault on January 6, 2021.

In a consensual interview with U.S. Capitol Police agents on March 25, 2021, at Mazza's home, Mazza admitted that he attended the Stop the Steal rally, and that he came onto the U.S. Capitol with the loaded Taurus Judge.  Mazza claimed that he lost that gun at approximately 3:15 p.m. while in a crowd of people inside the LWT tunnel. That statement was almost certainly false, since the weapon was recovered by CW-1, a U.S. Capitol Police Sergeant, who was assaulted by a person who had the firearm in their possession, at approximately 2:30 p.m.

Mazza falsely claimed that he observed violence against officers, but that he was a peacemaker who did not commit any acts of violence against police.  Mazza claimed to have helped officers who got dragged into the crowd after he left the tunnel area.  At no point in this interview did Mazza indicate he still had possession of the stolen baton or that he possessed another firearm on January 6th.  These false statements again obstructed the criminal and grand jury investigation and required law enforcement to expend significant additional resources and manpower.

After Mazza was arrested on November 17, 2021, a search warrant was executed at his home. Mazza agreed to be questioned after being advised of his *Miranda* rights.  Inside Mazza's home law enforcement officials recovered the stolen baton issued by the Metropolitan Police Department, a hat, jacket and clothing matching Mazza's clothing worn on January 6,

2021, a gun holster, over a 1,000 rounds of various types of ammunition, including 7.62 mm, .40 caliber, .45 long, and shotgun shells, as well as magazines for several other firearms, including AR-15 style banana clips and other semi-automatic magazines that were not recovered in the home. Mazza also had over a dozen hunting knives and swords strewn around his home and two pellet guns. Mazza had filed the serial number off the stolen baton to hide its true ownership. A photograph of the damaged baton recovered from the Mazza's home after his arrest in November 2021, is at Image 19.



**Image 19**

In his *Mirandized* statement to law enforcement officials after his arrest, Mazza admitted to taking the police baton on January 6, 2021, from the U.S. Capitol and to using it to strike a police officer in the tunnel. Mazza further admitted that he was recently in possession of several other firearms, but that he had given them to his brother out of concern he might be

arrested.  Mazza also told the officials that in searching  his home, they had missed the .40 caliber handgun he had possessed at the Capitol on January 6 and hidden in a floor safe in house. Mazza stated he had asked another person to retrieve the firearm after the search had been effectuated.  Mazza has since surrendered that gun  to law enforcement officials, and agreed to forfeit both guns and the seized ammunition  as part of his plea agreement.

### *Mazza's Other Post Arrest Conduct*

The government obtained search warrants for Mazza's electronic devices and social media pages.  A review of that material revealed that after January 6, 2021, Mazza searched for and viewed coverage about the January 6th attack on the U.S. Capitol.  For instance, he continued to watch videos about election conspiracy theories and followed Telegram groups of other conspiracy theories. He consumed "news" from Q'Anon and reports on a likely return to power of former President Trump even after President Biden had been sworn into office.

During FBI interviews of Mazza, he repeatedly attempted to blame members of Antifa for the violence on January 6, 2021, at the U.S. Capitol, based solely on social media rumors and memes**.**

### *Injuries*

As descried in Exhibit 4, MPD Officer P.N. did not suffer any lasting injuries from Mazza's specific baton blow in the LWT tunnel, but that he suffered injuries that day from other assaults on him by other rioters, including inside the LWT tunnel.  Mazza's participation in this riot helped those rioters who did succeed in injuring officers and destroying property. *See* Section II(A) ("Injuries and Property Damage Caused by the January 6, 2021 Attack") *supra.* Mazza's violent conduct also served to incite and embolden other violent rioters around him.

### III.   THE CHARGES AND PLEA AGREEMENT

On November 17, 2021, Mazza was arrested on a criminal complaint in this matter, and

on December 15, 2021, a federal grand jury sitting in Washington, D.C., returned an indictment

charging Mazza with thirteen offenses.[12]

On August 6, Mazza pled guilty pursuant to a guilty plea agreement to Count Four,

Assaulting, Resisting, or Impeding Certain Officers While Armed with a Deadly or Dangerous

Weapon in violation of 18 U.S.C. §§ 111(a)(1) and (b), and Count 10, Carrying a Pistol Without

a License, in violation of 22 D.C. Code § 4504(a).

### IV.   STATUTORY PENALTIES

Mazza now faces sentencing on Counts Four and Ten.   As noted by the plea agreement

and the U.S. Probation Office, Mazza faces up to 20 years of imprisonment, a fine up to

$250,000, and a term of supervised release of not more than three years for Count Four, and up

to five years imprisonment, a fine of up to $12,500, and a term of supervised release of not more

---

[12] They were: Count One, violation of 18 U.S.C. 231(a)(3) (civil disorder); Count Two, violation
of 18 U.S.C. § 1512(c)(2) (obstruction of a proceeding before Congress on January 6, 2021)
Count Three, violation of 18 U.S.C. § 1512 (c)(2) (obstructing a grand jury proceeding on
January 8, 2021); Count Four, violation of 18 U.S.C. 111(a)(1) and (b) (assaulting officers with a
deadly weapon); Count Five, violation of 18 U.S.C. § 1752(a)(1) (entering or remaining in a
restricted building with a deadly or dangerous weapon); Count Six, violation of 18 U.S.C.
§ 1752(a)(2) and (b)(1)(A) (disorderly and disruptive conduct in a restricted building or grounds
with a deadly weapon); Count Seven, violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A)
(engaging in physical violence in a restricted building with a deadly or dangerous weapon);
Count Eight, violation of 40 U.S.C. § 5104(e)(1)(A) (unlawful possession of a firearm on Capitol
Grounds or Buildings); Count Nine, violation of 40 U.S.C. § 5104(e)(2)(F) (violent entry and
disorderly conduct on Capitol Grounds); Count Ten, violation of 22 D.C. Code
§ 4504(a)(unlawful possession of a firearm without a license outside the home or place of
business); Count Eleven, violation of 7 D.C. Code § 2502.01(a)(possession of an unregistered
firearm); Count Twelve, violation of  D.C. Code 2506.01(3)(unlawful possession of
ammunition), and Count Thirteen, violation of 22 D.C. Code §§  3211, 3212(b) (second degree
theft).

than three years for Count 10.[13]

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.   The government has no objection to the draft PSR either for their calculations under the U.S.S.G. or the D.C. Voluntary Sentencing Guidelines.

This Court has full authority to run any sentence under the U.S. Code offense under the U.S.S.G. consecutively with a sentence for the D.C. Code offense.   *See, e.g.*, *United States v. Cutchin*, 956 F.2d 1216, 1219 (D.C. Cir. 1992) ("the Sentencing Guidelines apply only to federal crimes under 18 U.S.C. § 3551(a). Defendants found guilty of violations of the D.C. Code can only be sentenced under the D.C. Code. Because the Guidelines are silent on the issue, how a court is to relate a Guidelines sentence to a non-Guidelines sentence is a matter of discretion").

### Count Four:  Assault on a Federal Officer

The draft PSR and the plea agreement lay out the same Guidelines analysis for Count Four, as follows:

---

[13] The maximum sentence the Court could impose, however, is three years' incarceration, as the D.C. Code incorporates two years of back up time into the supervised release term that is incorporated into the statutory maximum. *See, e.g.*, 24 D.C. Code § 403.01(b)(7).

Count Four: 18 U.S.C. §§ 111(a)(1) and (b)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[14] | Base Offense Level | |
| | | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Use of Dangerous Weapon (Baton) | +4 |
| U.S.S.G. § 2A2.2(b)(7) | Conviction of 18 U.S.C. § 111(b) | +2 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | **Total** | **28** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | -3 |
| **Total Adjusted Offense Level:** | | **25** |

*See* Plea Agreement at ¶¶ 5(A); Draft PSR at ¶¶ 37-49.[15]

The U.S. Probation Office calculated Mazza's criminal history as category I for both guidelines, which the government does not dispute. Draft PSR at ¶¶ 54-56. Accordingly, based on the government's calculation of Mazza's total adjusted offense level for the U.S. Code offense, after acceptance of responsibility, at 25, Mazza's U.S.S.G. imprisonment range is 57 to 71 months. It is important to note that this applicable U.S.S.G. guideline does not account for any greater severity in the sentence because of Mazza's firearms. Specifically, U.S.S.G. § 2A2.2 does not apply a greater enhancement if the defendant possessed a firearm (legally or illegally).

**Count Ten:  Carrying a Pistol Without a License**

---

[14] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

[15] Based on the facts and circumstances of this case, the government does not seek imposition of an upward departure pursuant to U.S.S.G. § 3A1.4 n.4 (*see* Plea Agreement at ¶5(C)) because the sentence recommended above would  be sufficient, but not greater than necessary, to comply with the purposes of sentencing as set forth in 18 U.S.C. § § 3553(a)(2).

The parties agreed at the plea hearing that a violation of 22 D.C. Code § 4504(a)(1) is classified under the D.C. Sentencing Guidelines in Offense Severity Group M8.  *See* D.C. Sentencing Guidelines, Appendix C at C-5 and Appendix A.  The defendant has .25 Criminal History Points under the D.C. Sentencing Guidelines and has a criminal history score of "A."  Id. at Appendix A – Master Grid.  The parties agreed that the Estimated Sentencing Guideline Range under the D.C. Sentencing Guidelines is 6-24 months of imprisonment, with probation permissible.  *Id.*  The court may (1) suspend the imposition of sentence, (2) impose sentence and suspend the execution thereof, or (3) impose sentence and suspend the execution of a portion of the sentence.  *See* 16 D.C. Code § 710.  Moreover, under the D.C. Voluntary Sentencing Guidelines rules for consecutive and concurrent sentences, the Court has discretion to run the sentence for this count consecutively or concurrently to the sentence imposed for Count Four.[16]

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford

---

[16] Chapter 6.1, D.C. Sentencing Guidelines, requires a sentencing court to impose consecutive sentences for several situations, none of which apply to the instant case.  Chapter 6.2 requires a sentencing court to impose concurrent sentences where the offenses are "not crimes of violence: multiple offenses in a single event" or "for which a concurrent sentence is required by statute." Chapter 6.3 permits a sentencing court the discretion to impose concurrent or consecutive sentences in all other cases.  Here, Count 4 is a crime of violence under the D.C. Code.  *See* D.C. Code § 23-1331 ("The term 'crime of violence' means . . . assault with intent to commit any offense, assault with a dangerous weapon, aggravated assault . . . or an attempt or conspiracy to commit any of the foregoing offenses as defined by any Act of Congress or any State law, if the offense is punishable by imprisonment for more than one year.").  Because one of the two Counts in this case is a crime of violence committed during the same event, the Court has the discretion to impose either a consecutive or concurrent sentence.

adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, all the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, was a criminal offense unparalleled in American history.  It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants.  By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted law enforcement on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed.  As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with law enforcement.

While looking at Mazza's individual conduct, this Court, in determining a fair and just sentence, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly

where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The nature and circumstances of Mazza's crimes weigh heavily towards a significant term of incarceration. Mazza came to Washington, D.C. armed with two loaded firearms.  He brought both with him to the Ellipse where the President was speaking (obviously a gun free area), and later to the U.S. Capitol.  Upon approaching the Capitol, Mazza observed the crowd overwhelming police lines and breaching the security perimeter.  Mazza was completely undeterred by those observations in his effort to enter the U.S. Capitol.  Mazza ascended the West Front of the U.S. Capitol Building and thereafter worked with a mob of rioters to make a concerted effort to break through the police barricade in the LWT tunnel area while armed with a firearm and the baton he had stolen from a police officer

Mazza also helped other rioters in attacking the officers in the tunnel by holding open the door while others assaulted the officers.   He retreated only to gather more rioters to push against the offers and try to overwhelm them.

The government views Mazza's recruitment of additional rioters after his own assaultive activity as an important aggravating factor in this case.  Mazza's actions were not merely of a person who got caught up in the moment who could not see what was happening inside the tunnel; they instead show a person who was motivated and organized and willing to recruit others into violence against the officers even after he knew what was happening inside the

tunnel.  As a former member of the U.S. military, he should have recognized the great risk of serious injury or worse the officers faced in battling with angry mob that substantially outnumbered them.

Mazza's actions on January 6 show an absolute disregard for the rule of law coupled with a willingness to incite and engage in violence. But his actions after the riot to obstruct the criminal and grand jury investigation demonstrate his complete contempt of law enforcement. These actions include filing a false police report about how he lost his Taurus Judge, retaining possession of the stolen baton (as a trophy piece) and filing off its serial number, and repeatedly lying to FBI agents about his true conduct on January 6th.   Perhaps it is not surprising that Mazza continues to believe conspiracy theories about January 6th.

### B.  Mazza's History and Characteristics

Mazza served in the U.S. Army between 1985 and 1988 where he received weapons training.  He received a disability discharge and has received disability payments for over 34 years.

Mazza has a minor criminal history, but his November 10, 2021, conviction in Indiana state court for battery is very concerning.  *See* draft PSR ¶ 53.  According to the police report attached at Exhibit 5 (which is being filed under seal because it includes juvenile victims), on August 2, 2021, the juvenile victim (a Hispanic boy aged 12) was attacked by Mazza after he and his friends (aged 11, 12 and 14) made derogatory comments about Donald Trump after seeing a large Trump flag hanging above Mazza's home.  According to the report, Mazza responded to the victim and his friends that, Trump "kills n*****s like you," which led to a verbal and physical altercation during which Mazza picked up the 12-year-old victim by the neck, slammed

him on the ground and continued to hold him by the neck on the ground.  The victim indicated he

was unable to breathe for a period of the assault, which is not surprising given Mazza's size.  The

victim told officers when he was interviewed that he was still suffering pain on the back of his

head.  The report also indicates that Mazza told officers he got into the argument because the

victim used the "N" word and he wanted them to stop.  Mazza admitted to the police that he

assaulted the juvenile and held him down by the neck on the ground.[17]  The conduct and

conviction demonstrate that Mazza continues to have impulse control issues and that he is

violent, even toward juveniles.  This fact was noted by the officers who responded to the incident

in August 2021, as the report indicated that the responding officers warned Mazza, "he cannot

act this way just because people say things he does not like or agree with."  Exhibit 5 at 4.

Second, the assault at issue related to Mazza assaulting a neighborhood juvenile who he believed

had insulted the former President.  This criminal activity suggests Mazza continues to believe

that violence in defense of his views remains acceptable.

The government further notes the PSR discusses Mazza's significant use of (illegal)

controlled substances, including near in time to January 6, 2021, and a prior arrest for intoxicated

driving.  Draft PSR at ¶ 78.  These factors further support the government's belief that there is no

---

[17] Contrary to defendant's claim in his Sentencing Memorandum to this Court that this incident
was about "neighborhood thugs" using the "N" word in front of his children (see Def. Mem at p.
6), the police report at Exhibit 5 says nothing about "thugs" and does not suggest that either of
Mazza's two children (aged 17 and 18) were present during the altercation.  Indeed, the
defendant's own statement in the police report says nothing about the defendant's children and
the draft PSR indicates the children are both employed and reside with their mother in
Greenwood, Indiana.  Draft PSR at ¶ 68.  Also, in his debriefing conversations with the
government, Mazza admitted that the prior conviction was about the teenage boys who he
believed may have pulled down his Trump flag: he did not claim the fight was about their use of
the N word, or about his children.

basis to provide a downward departure or variance, and that consecutive sentencing on both charges is appropriate.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[18]  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Law enforcement officers were overwhelmed, outnumbered, and in some cases, in serious danger.  The rule of law was not only disrespected; it was under attack that day. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that attempts to obstruct official proceedings and assaults on police officers are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.   The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

---

[18] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[19] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly

---

[19] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this defendant also weighs heavily in favor of a lengthy term of incarceration. First, although Mazza has a criminal history category of I, his recent battery conviction and his admitted unlawful use of controlled substances show that he has anger issues and that he does not consistently adhere to the law. Second, Mazza engaged in substantial obstruction of law enforcement even after the incident. Third, Mazza was incredibly violent on January 6th both directly assaulting officers and assisting others in their violent conduct. Fourth, Mazza unlawfully brought two loaded and concealed handguns into sensitive areas in the District of Columbia on January 6, and carried them with him into the violent powder keg of the Capitol riot. Finally, Mazza has not to date expressed any semblance of remorse for his conduct. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v.*

*United States*, 551 U.S. 338, 349 (2007).   As required by Congress, the Commission has

"'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding

inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United*

*States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m).   In so doing, the Commission "has the

capacity courts lack to 'base its determinations on empirical data and national experience, guided

by professional staff with appropriate expertise,'" and "to formulate and constantly refine

national sentencing standards." *Kimbrough*, 552 U.S. at 108.   Accordingly, courts must give

"respectful consideration to the Guidelines." *Id.* at 101.   As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing
> Commission's in-depth research into prior sentences, presentence investigations,
> probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro,
> comment 3. More importantly, the Guidelines reflect Congress's determination of
> potential punishments, as set forth in statutes, and Congress's on-going approval
> of Guidelines sentencing, through oversight of the Guidelines revision process.
> See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to
> the Guidelines). Because the Guidelines reflect the collected wisdom of various
> institutions, they deserve careful consideration in each case. Because they have
> been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005).   "[W]here judge and Commission *both*

determine that the Guidelines sentences is an appropriate sentence for the case at hand, that

sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary'

requirement)," and that "significantly increases the likelihood that the sentence is a reasonable

one." *Rita*, 551 U.S. at 347 (emphasis in original).   In other words, "the Commission's

recommendation of a sentencing range will 'reflect a rough approximation of sentences that

might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

   Here, while the Court must balance all of the § 3553 factors to fashion a just and

appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark.   As

this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines' analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.      Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that Mazza and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases. To try to mechanically compare other § 111 or 1512 defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

While no other Capitol Siege case has the same facts of violence toward officers, obstruction of the Congressional Proceeding, possession of firearms and obstruction of a grand jury investigation that as this case, the matter of *United States v. Devlyn Thompson*, 21-cr-641 (RCL) has some important similarities. Thompson was involved in striking an officer with a baton one time in the LWT tunnel shortly before Mazza entered the tunnel, and like Mazza he pled guilty to one count of violating 18 U.S.C. §§(a)(1) and (b). Like Mazza he was observed the activity in the LWT tunnel before getting to the front of the tunnel, and he took a baton off the ground and struck an officer one time with no significant injury to the officer. Thompson was hit by OC spray and retreated shortly after the assault. Unlike Thompson, however, Mazza was: (1) armed with multiple loaded firearms, (2) in the tunnel area longer and involved in more

assaultive conduct toward the officers; (3) helped and recruited others into assaulting officers inside the tunnel; (4) stole government property, and (5) engaged in substantial obstruction of justice. Thompson was also unique in that his remorse and his efforts to assist law enforcement were exceptional: prior to being arrested or even approached by law enforcement, Thompson obtained counsel and contacted government counsel to provide assistance to the January 6th investigation. Thompson agreed to a plea agreement and walked himself into a plea without being arrested. Thompson also argued at sentencing that he suffered from autism spectrum disorder (Asperger's Syndrome) and that mitigated his conduct. Thompson was sentenced to 46 months incarceration.

Similarly, in *United States v. Duke Wilson*, 21-cr-345 (RCL), the defendant was involved in assaultive conduct in the LWT tunnel area just as defendant Mazza entered the same tunnel area. Wilson, 67 years old, approached the front of the tunnel area and attempted to open the doors in the tunnel. After he was sprayed with a chemical irritant by officers defending the line, Wilson picked up several-feet long PVC pipes and threw them into the crowd of officers. He also threw another object at the officers and helped take a shield from one of the officers in the tunnel. The defendant pled guilty to one count of violating 18 U.S.C. § 111(a) and one count of Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512, and he was sentenced to 51 months incarceration. Like Thompson, Wilson did not have a firearm, did not obstruct the investigation, and did not try to encourage others to push in the tunnel.[20]

---

[20] Two other assault cases bear noting. First, in *United States v. Robert Palmer* (TSC), Palmer, 54, assaulted officers who were protecting the LWT tunnel area after 4:50 p.m. and received 63 months incarceration. Palmer threw a wooden plank at officers, used a fire extinguisher against the officers, and tried to rush the officers with a pole before being struck with a pepper ball fired from officers that stopped the attack, and pled guilty to one count of violating 18 U.S.C. §§

In *United States v. Webster*, 21cr208 (APM), the defendant, like Mazza, played a violent role in the attack on the Capitol. Like Mazza, Webster was a former member of the armed forces. Unlike Mazza, he was also a police officer. Like Mazza, Webster was an agitator who riled up the mob with his rhetoric and rage. He violently attacked a police officer on the Lower West Terrace, which resulted in opening a breach in the police line there and the flood of rioters towards the Capitol. Webster, like Mazza, did not regret his actions on January 6. Unlike Mazza, Webster did not plead guilty and was convicted of all charges, including a violation of 18 U.S.C. § 111(a)(1) and (b).  Judge Mehta sentenced Webster to 120 month's incarceration.

There has also been one other Capitol Siege case in which the defendant was convicted of a U.S. Code offense and for unlawfully possessing firearms on January 6, 2021, in violation of the D.C. Criminal Code: *United States v. Lonnie Coffman*, 21-cr-02. There, Judge Kollar Kotelly sentenced the 72-year-old defendant to 46 months incarceration for having Molotov cocktails and unregistered firearms in his truck near the U.S. Capitol.  The *Coffman* case suggests a substantial sentence for possession of the firearm only in this matter is appropriate, particularly since there was no evidence that Coffman engaged in any violence.

Taken together, these cases confirm that Courts have been providing additional periods of incarceration for January 6th defendants who assaulted law enforcement officers in the LWT

---

111(a) and (b).  Notably, he lost his acceptance of responsibility credit for continuing to assert his innocence in public social media fundraising posts following his guilty plea.  Second, in *United States v. Guy Wesley Reffitt*, 21-cr-32 (DLF), Reffitt went to trial and was sentenced to 87 months incarceration after being convicted of multiple felony offenses, including 18 U.S.C. § 1512.  Reffitt was a militia leader who encouraged others to conduct violence on January 6, 2021, but he did not personally engage in violent acts against officers.  While Reffitt was not charged with a firearm offense in the indictment, the government adduced evidence at sentencing that Reffitt was armed with a loaded firearm at the U.S. Capitol when he led others to attack the U.S. Capitol.

tunnel, and those who possessed firearms on January 6th, and further support the government's view that consecutive sentencing is appropriate in this case.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[21] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victim in this case, Officer P.N., did not suffer bodily injury because of Mazza's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Mazza must pay $2,150, $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Mazza played in the riot on January 6, and $150 to the Metropolitan Police Department.[22]  Plea Agreement at ¶ 11.

---

[21] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[22] Unlike under the Sentencing Guidelines for which (as noted above) the government does not

## VIII.   FINE

Mazza's convictions subject him to a statutory maximum fine of $262,500.   In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

Mazza does not have significant financial assets, but the parties ask that the Court sign the stipulated order of forfeiture relating to the firearms and ammunition, as set forth in the plea agreement.[23]

## IX.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a total sentence of imprisonment of 78 months, which represents consecutive a mid-range sentences for both charges as calculated by the government and as agreed upon by the parties in the plea agreement, restitution of $2,150, and the mandatory $100 special assessment for each count of conviction.

---

qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

[23] Mazza has been raising money for his legal defense at https://www.givesendgo.com/G285Y. The site has been active for approximately one year, and to date, Mazza has raised approximately $660. In his online pitch, Mazza stated, "I am a Patriot not a threat.  I am a God fearing man! Help me pay my attorneys fees or else I will be at the mercy of the corrupt court system of Washington, D.C."

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY: _____ /S/ _____

Tejpal S. Chawla
D.C. Bar No. 464012
Assistant United States Attorney
National Security Section
U.S. Attorney's Office
601 D Street, N.W., 5th Floor
Washington, D.C. 20530
Office: 202-252-7280
Tejpal.Chawla@usdoj.gov